John M. BURCH, Plaintiff-Appellant,

v.

**INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE WORKERS, AFL–CIO, Defendant-Appellee.**

**No. 27398.**

United States Court of Appeals,
Fifth Circuit.

Nov. 2, 1970.

Hugo L. Black, Jr., Kelly, Black, Black & Kenny, Miami, Fla., for plaintiff-appellant.

Joseph P. Manners, Manners & Amoon, Miami, Fla., Plato E. Papps, Washington, D. C., for defendant-appellee.

Before WISDOM, SIMPSON and CLARK, Circuit Judges.

SIMPSON, Circuit Judge:

In this appeal John Burch seeks relief from a lower court judgment which held that his membership in appellee, International Association of Machinists and Aerospace Workers (IAM), had been lawfully terminated for nonpayment of dues and that his term as President and General Chairman of the Executive Board of District Lodge No. 145 had thereby abruptly ended.

Burch raises three issues: first, that the action of IAM in terminating his membership was in violation of the freedom of speech provision of the Landrum-Griffin Act,[1] second, that the district court erred in its Finding of Fact No. 10 which states: "There has been no showing that the Defendant has accepted the late payment of dues from or on behalf of others"; and third, that his membership termination was in violation of the due process provision of the Landrum-Griffin Act.[2]

Although we treat briefly appellant's first and third arguments and find them without merit, we agree with appellant as to the second issue stated above, and, holding this finding of fact clearly erroneous, we reverse.

Appellant Burch had been a member of District Lodge No. 145 and Local No. 368 of IAM located at Miami, Florida, since 1957. The Local was composed primarily of employees of National Airlines. From 1963 to 1967 Burch held the position of President and General Chairman of the Executive Board of District Lodge No. 145, having twice been elected to this position for four year terms. Late in his first term, Burch fell into disfavor with the IAM because he had refused to sign certain agreements and because he had withdrawn charges against a union member, John Carroll, who, it was claimed, had been involved in an unsuccessful attempt to have another union certified as the collective bargaining representative for the employees of National Airlines. Shortly thereafter, petitions were circulated in New York and Miami calling for the resignation of appellant as General Chairman. The petitions were not effective in removing him from office.

On October 2, 1967, the financial secretary of the local lodge, William Moot, went to appellant's office and inspected appellant's dues books. At that time appellant was in Washington, D. C., having been summoned there by President Seimiller of IAM to discuss appellant's dismissal of the Carroll charges. Moot found that Burch was two days past the permissible deliquency date in the payment of his dues. It was then announced that appellant's membership with the IAM had lapsed at midnight, September 30th, pursuant to a provision in the union's constitution.[3] The same day, the delinquent dues were tendered to Moot who refused to accept them. After the local union ordered Moot to accept

1. Title 29 U.S.C. § 411(a) (2) provides:
   "*Freedom of speech and assembly.*
      Every member of any labor organization shall have the right to meet and assemble freely with other members; and to express any views, arguments, or opinions; and to express at meetings of the labor organization his views, upon candidates in an election of the labor organization or upon any business properly before the meeting, subject to the organization's established and reasonable rules pertaining to the conduct of meetings: *Provided,* That nothing herein shall be construed to impair the right of a labor organization to adopt and enforce reasonable rules as to the responsibility of every member toward the organization as an institution and to his refraining from conduct that would interfere with its performance of its legal or contractual obligations."

2. Title 29, U.S.C., § 411(a) (5) provides:
   "*(5) Safeguards against improper disciplinary action.*—No member of any labor organization may be fined, suspended, expelled, or otherwise disciplined *except for nonpayment of dues* by such organization or by any officer thereof unless such member has been (A) served with written specific charges; (B) given a reasonable time to prepare his defense; [and] (C) afforded a full and fair hearing." (Emphasis added)

3. Article I, Section 15 reads:
   "Delinquency for 3 months in the payment of dues or special levies * * * shall automatically cancel membership and all rights, privileges and benefits incident thereto. The period of good-standing membership of members whose membership has been cancelled for delinquency or other cause shall date from their last reinstatement * * * and their rights, privileges and benefits * * * shall attach and date from their last reinstatement, as though they had never before held membership in the I.A.M."

Burch's dues, and Moot again refused, District Lodge No. 145 was instructed by IAM to remove Burch from the payroll because of the "lapsation" of his membership.

As to the first issue raised by Burch, the contention that his membership termination violated the freedom of speech provision of the Landrum-Griffin Act is not factually supported and is without merit. Although it seems clear that the IAM was displeased with some of Burch's actions as president of District Lodge No. 145, it is nowhere demonstrated that such displeasure, when coupled with his membership termination for non-payment of dues, amounted to a denial of his freedom of speech. True, IAM may have been prompted by its displeasure with Burch to look for a legitimate means with which to depose him. However, under the facts of this case, it is not any supposed effect on free speech which concerns us, but rather the possible arbitrary application of the means used to oust him (dues lapsation).

Burch's third contention is also without merit. It is argued that his right to due process under Title 29, U.S.C., Section 411(a) (5) of the Landrum-Griffin Act, supra, footnote 2, was violated when, under Article I, Section 15 of the IAM Constitution, supra, footnote 3, his membership was automatically cancelled, for failure to pay dues, without a hearing or other procedural elements of due process.

As is readily apparent, Section 411(a) (5) specifically provides that such procedures are not required where a member is being expelled for the nonpayment of dues. Rather than attack this provision, Burch seeks to distinguish from it the provision of the IAM Constitution under which his membership was cancelled. He maintains that since the constitution predicates membership cancellation upon a *delinquency* in dues payment, it violates the Act which allows cancellation for *nonpayment* of dues. We are not able to find validity in the distinction. The import of both provisions is the au-

tomatic termination without a hearing of a membership for a failure to pay dues. We find ourselves in agreement with the district court that Article I, Section 15 of the IAM Constitution is not violative of the Landrum-Griffin Act.

We proceed to the second issue presented: whether the lower court correctly found that there was no showing that IAM had accepted the late payment of dues from or on behalf of others. The following review of pertinent testimony and other evidence should demonstrate that there was in fact such a showing, contrary to the district court's Finding of Fact No. 10.

Mr. Fox, a member of Burch's local testified in part as follows:

"Q. Now, in June, 1967, did you have any conversation with Mr. Moot about the state of your dues?

A. I went to pay dues in the month of June, and when I paid my dues two months, I was informed that I was still two months in arrears.

Q. Do you mean you were informed by whom?

A. By Mr. Moot.

Q. In other words, you paid him or gave him a check for two months' dues?

A. I gave him a check for two months' dues, and he informed me that I was still two months in arrears. I said that I didn't have the money, I would send a check the next payday, which was two weeks.

Q. And what did he say?

A. 'Okay'.

Q. Now, on the date that you talked with Mr. Moot first, did you give Mr. Moot a check?

A. I did.

Q. I will show you Plaintiff's Exhibit No. 13 which consists of two checks and ask you to look at the first one and ask you if you can identify that, please, sir.

A. This is the check—that is the first contact I had with Mr. Moot about my

dues. I had just come off vacation and this is when I was informed. I give him the check for $12 and he told me I was still short, and I said I would make it the next day.

Q. Short by how much?

A. I was short by two months.

Q. Still short two months?

A. Yes, because when I wrote this check in June, I had not paid for March or April, and I did not pay May.

Q. How about May?

A. I hadn't paid May.

Q. How about June? Had you paid for June?

A. I hadn't paid June. This was the first check to cover March and April, and I was informed I was still two months in arrears and in two weeks I give him another check".

IAM directs our attention to no evidence which contradicts the above testimony, nor do we find any upon examination of the record. IAM's witness, Mr. Moot, testified in part:

"Q. Mr. Moot, with reference to Mr. Norbert Fox, do you know him?

A. Yes, sir.

Q. Were you here when he testified?

A. Yes, sir.

Q. Do you have any disagreement with what he had to say when he testified?

A. I'll be frank with you in regard to Brother Fox. I don't remember what he—it's vague. Nothing that he said—I don't remember that business."

Certainly such testimony will not support a contention that Mr. Fox's dues were not accepted late.

The following is a portion of the testimony of Mr. Sonneberger, also a member of the same local as Burch:

"Q. Mr. Sonneberger, before you went on check-off, how did you pay your dues?

A. Every three months or longer.

Q. Did you pay them by check?

A. Yes, sir.

Q. Did you ever pay them late?

A. Yes, sir.

Q. What happened when you paid them late?

A. Well, the first time I paid them late the financial secretary came into the department. I had gotten a notice through the mail that I was delinquent. And then—I don't know—it had slipped my mind or something—but the financial secretary came into the department and reminded me of the fact that I was delinquent.

Q. And what did you do?

A. Well, he told me the first time I was delinquent, if I could get him a check—he said he had not sent the—

Q. The lapse?

A. The notice into Washington, and if I would get him a check before quitting time that day I would be all right.

Q. Did you give him a check before quitting that day?

A. I did. I borrowed a check.

Q. Do you have that check with you?

A. I do.

Q. Would you take it out, please, sir?

A. (Producing check)

Q. What are you holding in your hand here?

A. This is the check dated the 11th month, 2nd day, 1964, to the Seminole Lodge 368.

Q. How much is it for?

A. $15.

Q. How many months' dues is that?

A. Three.

MR. BLACK:

Will you mark this, please?
    (Plaintiff's Exhibit No. 6 for identification.)

BY MR. BLACK:

Q. Mr. Sonneberger, who was the financial secretary who accepted that check?

A. Mr. Moot.

Q. Do you see Mr. Moot here in the courtroom?

A. Yes, sir. The man on the end. (Plaintiff's Exhibit No. 6 in evidence.)

BY MR. BLACK:

Q. Mr. Sonneberger, were you ever late on any other occasions by more than three months?

A. The next period.

Q. The very next period?

A. Yes, sir.

Q. Tell the Court what happened then.

A. Well, it just slipped my mind again. I had sent the check out to Bill Moot and he had turned it down. And Mr. Burch talked to Bill Moot on the check and he talked him into accepting the check.

Q. All right. Do you have that check with you?

A. Yes, sir.

Q. Would you take it out, please, sir?

A. (Producing document)

MR. BLACK:

Will you mark this as the Plaintiff's next exhibit number, please?

(Plaintiff's Exhibit No. 7 for identification.)

BY MR. BLACK:

Q. Is this the check you referred to, sir?

A. Yes, sir.

Q. What is the date on it?

A. 2/1/65.

Q. What was the last day on which your dues were due?

A. It should be 1/31."

In short, Mr. Sonneberger testified that on two successive occasions he tendered his dues late and each time they were accepted by Mr. Moot, once on November 2, 1964, two days past the permissible delinquency date, and once on February 1, 1965, one day past. The checks dated as above set forth were received in evidence.

Mr. Moot referred to Sonneberger's dues ledger card which Moot maintained. Relative to the check for $15 dated November 2, 1964, (two days overdue), the ledger showed payments of $5 on October 29th and two $5 payments on November 1st. On cross-examination, Moot's explanation of this discrepancy was that Sonneberger had actually not paid his dues until after the lapse date but that he, Moot, had paid the dues for Sonneberger on October 29th and that Sonneberger had repaid him with the $15 check on November 2nd. Moot further stated he could not remember why he had paid Sonneberger's dues.

As to the check for $15 dated February 1st, (one day overdue), again, Moot's ledger failed to show a $15 payment on that date but instead showed three $5 payments on January 31st. Moot could give no explanation for this discrepancy except that for some unknown reason Sonneberger may have paid him on the 31st but dated the check the 1st of February. Since January 31st was the deadline for Sonneberger's dues payment beyond which he would be lapsed, it seems unreasonable to suppose that he would pay his dues on that date, yet date his payment check February 1st, one clear day past the deadline.

Mr. Coley, who succeeded William Moot as financial secretary testified that Moot's records showed that a Mr. Lopez paid his dues for May 1966 on June 30th and failed to pay any further dues until November of that year. IAM points out on brief that strike stamps were issued for the months of July and August. Despite this fact and although Mr. Coley, in a state of apparent confusion, changed his mind on cross-examination and said the ledger indicated Mr. Lopez's dues had not lapsed, we think the contrary is clearly indicated. It appears undisputed that after paying his May dues, Lopez made no further dues payments until November 12th. No dues were required during two months of this interval because of strike stamps being issued instead. This being the case, simple subtraction leaves three months dues owing

and unpaid as of October 31. Lopez's dues payment was therefore accepted late when made on November 12, 1966.

Other evidence [4] also indicates a strong probability that IAM had accepted dues late at other times in the past, but it is unnecessary to rely upon that evidence. Late acceptance was clearly demonstrated by the testimony detailed above.

Therefore, upon review of all the evidence, we are left with the definite and firm conviction that a mistake has been committed and that the district judge was clearly erroneous in his Finding of Fact No. 10. McAllister v. U. S., 348 U.S. 19, 75 S.Ct. 6, 99 L.Ed. 20 (1954); F.R. Civ.P. 52(a).

■ We note IAM's technical argument that any late acceptance of dues by local secretaries was ultra vires and therefore not attributable to the International. This contention is bare of merit in view of the union's acquiescence in such acceptances and the benefit it derived from them, i. e. the funds themselves.

Given the fact that some whose dues are lapsed have their membership cancelled while others in the same situation are allowed to retain their membership,[5] the question looms in the case of an ousted member, as to why, other than dues lapsation, his membership was cancelled. The district court never reached this question in regard to Burch. Finding of Fact No. 10 precluded its being reached.

■ Upon remand the district court should make further findings of fact on the record as it stands or as supplemented by additional evidence as to any additional reason for Burch's dismissal in the light of our finding of clearly erroneous as to Finding of Fact No. 10, and state its conclusions of law based

thereon. If it is eventually determined by that court that the dues lapsation clause was arbitrarily and discriminatorily applied with respect to Burch or that he was otherwise illegally expelled from the union, appropriate relief should be fashioned including reinstatement as President and General Manager of District Lodge 145 (provided that reinstatement is then still feasible), and money damages. This direction is by no means intended to prevent a result favorable to IAM should the evidence finally justify it under applicable law.

Reversed and remanded.

---

4. Testimony of Mr. Moorhead of New York and Mr. Kaminsky of Houston regarding incidents in their respective locals and the testimony of Mr. Watts, successor to Burch as District Lodge President, regarding prior policy in Burch's local.

5. We note the possible tacit approval of such action in Article II, Section 4, IAM Constitution which provides in part:
   "Members who fail to pay their *dues*, assessments or other fees within the periods required by this Constitution or by-laws of their L.L. or D.L. will be *subject* to automatic cancellation * * *" (Emphasis added)